Nebraska Supreme Court Online Library
www.nebraska.gov/courts/epub/
01/29/2016 09:04 AM CST

State of Nebraska, appellee, v. Frederick E. McSwine,
also known as Frederick E. Johnson, appellant.

___ N.W.2d ___

Filed January 29, 2016.    No. S-13-887.

1. **Motions for New Trial: Prosecuting Attorneys: Appeal and Error.**
An appellate court reviews a motion for new trial on the basis of pros-
ecutorial misconduct for an abuse of discretion of the trial court.

2. **Appeal and Error.** Plain error may be found on appeal when an error
unasserted or uncomplained of at trial, but plainly evident from the
record, prejudicially affects a litigant's substantial right and, if uncor-
rected, would result in damage to the integrity, reputation, and fairness
of the judicial process.

3. **Trial: Prosecuting Attorneys: Appeal and Error.** When considering
a claim of prosecutorial misconduct, an appellate court first considers
whether the prosecutor's acts constitute misconduct.

4. **Trial: Prosecuting Attorneys: Juries.** A prosecutor's conduct that does
not mislead and unduly influence the jury is not misconduct.

5. **Trial: Prosecuting Attorneys: Appeal and Error.** If an appellate court
concludes that a prosecutor's acts were misconduct, the court next
considers whether the misconduct prejudiced the defendant's right to a
fair trial.

6. **Trial: Prosecuting Attorneys: Due Process.** Prosecutorial misconduct
prejudices a defendant's right to a fair trial when the misconduct so
infected the trial that the resulting conviction violates due process.

7. **Trial: Prosecuting Attorneys.** Whether prosecutorial misconduct is
prejudicial depends largely on the context of the trial as a whole.

8. **Trial: Prosecuting Attorneys: Appeal and Error.** In determining
whether a prosecutor's improper conduct prejudiced the defendant's
right to a fair trial, an appellate court considers the following factors:
(1) the degree to which the prosecutor's conduct or remarks tended to
mislead or unduly influence the jury; (2) whether the conduct or remarks
were extensive or isolated; (3) whether defense counsel invited the

remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction.

9. **Trial: Prosecuting Attorneys: Evidence.** A prosecutor must base his or her argument on the evidence introduced at trial rather than on matters not in evidence.

10. **Trial: Evidence.** A fact finder can rely only on evidence actually offered and admitted at trial and is not permitted to rely on matters not in evidence.

11. **Juries: Jury Instructions.** The purpose of jury instructions is to assure decisions that are consistent with the evidence and the law, and to inform the jury clearly and succinctly of the role it is to play, the decisions it must make, and to assist and guide the jury in understanding the case and considering testimony.

12. **Verdicts: Juries: Jury Instructions: Presumptions.** Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.

13. **Trial: Appeal and Error.** A party is normally required to object to a perceived error by a trial court in order to preserve that issue for appeal.

14. **Appeal and Error.** A party is not permitted, without objection, to take the chances of a favorable result and then, if disappointed, for the first time complain.

15. **Trial: Prosecuting Attorneys.** Public prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial.

16. **Prosecuting Attorneys: Convictions.** It is as much a prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

17. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.

Petition for further review from the Court of Appeals, IRWIN, INBODY, and PIRTLE, Judges, on appeal thereto from the District Court for Lancaster County, PAUL D. MERRITT, JR., Judge. Judgment of Court of Appeals reversed, and cause remanded for further proceedings.

Mark E. Rappl for appellant.

Douglas J. Peterson and Jon Bruning, Attorneys General, and Kimberly A. Klein for appellee.

Heavican, C.J., Wright, Connolly, McCormack, Miller-Lerman, and Cassel, JJ.

Heavican, C.J.

INTRODUCTION

Frederick E. McSwine, also known as Frederick E. Johnson, was convicted of terroristic threats, kidnapping, first degree sexual assault, and use of a deadly weapon to commit a felony. He was sentenced to a total of 57 to 85 years' imprisonment. On appeal, the Nebraska Court of Appeals reversed, concluding on plain error review that the State committed prosecutorial misconduct in its closing arguments.[1] We granted the State's petition for further review. We reverse the decision of the Court of Appeals and remand the cause for further proceedings.

FACTUAL BACKGROUND

McSwine was charged with terroristic threats, kidnapping, first degree sexual assault, and use of a deadly weapon to commit a felony. The charges arise from October 2012 allegations that McSwine abducted C.S. at knifepoint and drove her around rural Lancaster County, in an area near Waverly, Nebraska, periodically stopping to sexually assault her. McSwine and C.S. originally met because McSwine worked at a convenience store in Waverly, which store C.S. had frequented.

C.S. testified that McSwine knocked on her door the morning of October 13, 2012, and asked to use her bathroom. This was not the first time that McSwine had asked to use her bathroom; a week or two earlier, at a time when C.S. had guests, McSwine stopped to use the bathroom and left without incident. But according to C.S.' testimony, on this occasion, after purportedly using the bathroom, McSwine pulled out a pocketknife and forced C.S. out of the apartment. At the

---

[1] *State v. McSwine*, 22 Neb. App. 791, 860 N.W.2d 776 (2015).

time, C.S.' boyfriend was sleeping in the apartment. C.S. was wearing a pair of pajama shorts under a pair of longer pajama pants, a sports bra, and a flannel shirt. C.S. was not wearing shoes. She also left her identification, money, and cell phone in her apartment.

C.S. testified that McSwine then drove around rural Lancaster County, near Waverly. On three occasions, McSwine allegedly drove into isolated areas and forced C.S. to engage in various sexual acts. After about 5 hours, McSwine allowed C.S. to leave his car. C.S. jumped over a guardrail near where McSwine let her out of the car and ran, still barefoot, to a nearby home, where law enforcement was notified. According to C.S., though McSwine originally let her leave the car, she later saw him head toward her as she knocked on the door of the home.

In addition to C.S.' testimony, the State offered the testimony of a friend of McSwine's. This witness testified that McSwine told him that he had abducted and sexually assaulted C.S. at knifepoint. His testimony largely corroborated the narrative to which C.S. testified. The witness' testimony was given as part of a cooperation agreement with the State.

The State also offered testimony of the nurse who performed C.S.' sexual assault examination. According to the nurse's testimony, there was a laceration to C.S.' vagina. The nurse testified that lacerations such as the one C.S. suffered were caused by blunt force trauma and were consistent with sexual assault and also with sexual penetration "if it's rough sex where there's a lot of force."

McSwine testified in his own behalf. McSwine did not contest that he had sexual contact with C.S. and agreed that those acts occurred in isolated areas surrounding Waverly. But McSwine testified that those acts were consensual. McSwine testified that C.S. became upset with him when she discovered that he had lied to her about having a charger for his cell phone. According to McSwine, C.S. then accused McSwine of being selfish, of lying to her, and of using her for sex. At this

point, according to McSwine, C.S. insisted that he stop the car and let her out. McSwine testified that he did so.

McSwine's counsel argued in closing arguments that C.S. had concocted the story about McSwine's abducting and sexually assaulting her because she was angry at McSwine and because she did not want her parents or boyfriend to be upset with her because of her actions.

At trial, the State introduced certain text messages from McSwine to his wife and from McSwine to a friend. According to the State, these messages showed McSwine's feelings of guilt and remorse over his actions involving C.S. In summary, the State argued McSwine both knew that C.S. had run from his car directly to a residence and assumed that C.S. would inform law enforcement of McSwine's actions and could identify him because they had previously met.

In the messages from McSwine to his wife, McSwine indicated that he had "messed up bad" and that "[c]ops are probably going to be looking for me [and] if they are I'm going to run." McSwine also apologized to his wife and stated that he "[did not] deserve [her and wished he] didn't f*** everything up." In a later text message, McSwine asked his wife if she "would give [him] up even if [he] was dead wrong and did some foul s***." In these messages, McSwine discussed running away to Mexico or to a "reservation."

In the messages from McSwine to his friend, McSwine stated that he had gotten himself into trouble, that he "might be taking a trip," and that he did not know "what [he] was thinking." McSwine then stated that he "f*** this all up."

But McSwine testified that the text messages did not indicate grief or remorse about kidnapping and sexually assaulting C.S., but instead were an indication of his concern about an incident that happened prior to the incident involving C.S. McSwine testified that in the early morning hours of October 13, 2012, he had been selling marijuana to the friend of a friend in Eagle, Nebraska. During the exchange, McSwine got nervous that the buyer was going to rob him, so he hit the

buyer and ran into and through a nearby house. An elderly woman in the house confronted him; he apologized and ran back out.

McSwine testified that at the time of this incident, he had just finished smoking methamphetamine. McSwine explained that he assumed that because he was on parole, he would be facing significant charges for this encounter.

Other than McSwine's testimony, there was no evidence presented at trial that this trespassing incident occurred. On cross-examination, the State inquired whether McSwine knew if any reports had been filed on this incident. McSwine replied that he did not know.

During its closing argument, the State focused in part on McSwine's testimony about the motivation for the text messages. The prosecutor informed the jury that McSwine's testimony that he trespassed by walking into someone's house was "unsupported by any evidence at all. It's just him saying that that happened." In the prosecutor's rebuttal, he stated: "There is nothing that supports [McSwine's] statement or his testimony that he ran through some house . . . nothing. It's just his word." There was no objection to either of these comments.

Following closing arguments, the jury was instructed and then retired to deliberate. During those deliberations, the jurors inquired of the court as follows: "Did [the prosecutor] say that there was no evidence . . . including a police report . . . of . . . McSwine's presence in a local house . . . ?" The court responded to the jury's question by informing the jury that it had all of the evidence it was going to receive in the case and further directed the jury to one of its instructions. Neither the State nor McSwine's counsel objected to the court's handling of the question.

McSwine was ultimately found guilty. He filed a motion for new trial, alleging that the prosecutor's statements during closing arguments indicating that there was no evidence to support McSwine's testimony that he had trespassed through a house

in the early morning hours of October 13, 2012, were mis-leading, because there was evidence of a trespass, supported by various police reports. The police reports were originally provided to the defense by the State, but were not offered by either side or otherwise admitted as evidence at trial.

In support of his motion for new trial, McSwine offered into evidence those police reports. According to the reports, at the time of the event, the homeowner identified McSwine as the trespasser based upon a picture obtained from the security camera of a convenience store located in Eagle. Months later, however, the homeowner was not able to identify McSwine from a photographic lineup. Also offered was an affidavit from McSwine's counsel averring that his failure to object was a mistake and not trial strategy and that he failed to object because, at the time, he believed the State was arguing that there was no such evidence "'presented at trial.'"

McSwine's motion for new trial was overruled because counsel did not object to the comments. McSwine was sentenced to a total of 57 to 85 years' imprisonment. McSwine appealed to the Court of Appeals. Among other assignments of error, McSwine argued that the State committed prosecutorial misconduct in its closing arguments.

The Court of Appeals first noted that McSwine did not object to the prosecutor's statements at the time the statements were made. The Court of Appeals then reviewed the record for plain error and concluded that there was plain error in the State's closing arguments:

Evidence offered by McSwine at the hearing on his motion for new trial revealed that the prosecutor's statements about the lack of evidence supporting McSwine's testimony were misleading. On two separate occasions, the prosecutor told the jury that there was no evidence which supported McSwine's testimony that on October 13, 2012, prior to his interaction with C.S., he had committed various criminal offenses, including trespassing through a residence. The prosecutor's comments were not

qualified in a way so as to suggest that there was simply no evidence presented at the trial. Instead, the prosecutor unambiguously stated that the only evidence of the trespass was McSwine's testimony: "There is nothing that supports [McSwine's] statement or his testimony that he ran through some house . . . nothing. It's just his word." These comments were misleading in that they made it appear to the jury as though McSwine's explanation about why he sent the incriminating text messages lacked any credibility, when, in fact, there was evidence that McSwine had committed other criminal acts on October 13 which in no way involved C.S.

Even more concerning than the effect these false statements had on the jurors is the evidence that the prosecutor knew the statements to be false or misleading when making them. The prosecutor knew that there was, in fact, evidence about the trespass, because he forwarded to defense counsel police reports about that trespass and about McSwine's being the one who committed the trespass. In addition, defense counsel stated in his affidavit that he and the prosecutor had a discussion about the trespass prior to trial. At that time, the prosecutor specifically indicated that he was not going to offer any evidence about that act at trial.

Because the prosecutor's comments were misleading and were made with knowledge of their inaccuracy and untruthfulness, we conclude that the comments were improper in nature.[2]

The Court of Appeals then turned to the issue of whether the improper nature of the statements prejudiced McSwine's right to a fair trial and concluded that it did.

The Court of Appeals also found merit to McSwine's assertion that his trial counsel was ineffective for failing to timely object to the prosecutor's statements about the lack of evidence to support McSwine's explanation of the text messages.

---

[2] *Id.* at 799-800, 860 N.W.2d at 784.

The Court of Appeals declined to reach McSwine's remaining assignments of error. Ultimately, the Court of Appeals reversed McSwine's convictions and remanded the cause for a new trial.[3] We granted the State's petition for further review.

## ASSIGNMENT OF ERROR

The State assigns that the Court of Appeals erred in reversing McSwine's convictions and remanding the cause for a new trial.

## STANDARD OF REVIEW

[1] An appellate court reviews a motion for new trial on the basis of prosecutorial misconduct for an abuse of discretion of the trial court.[4]

[2] Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.[5]

## ANALYSIS

The Court of Appeals reversed McSwine's convictions and remanded the cause for a new trial. The basis of the court's opinion was that the State committed prosecutorial misconduct such that despite a lack of objection by McSwine was so plainly error that "[left] uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process."[6]

We begin our analysis by noting that this case presents an odd procedural position. In the "typical" direct appeal which ultimately raises issues of plain error, the "error" is not raised

---

[3] State v. McSwine, supra note 1.

[4] State v. Williams, 282 Neb. 182, 802 N.W.2d 421 (2011).

[5] State v. Alarcon-Chavez, 284 Neb. 322, 821 N.W.2d 359 (2012).

[6] State v. McSwine, supra note 1, 22 Neb. App. at 798, 860 N.W.2d at 783. Accord State v. Scott, 284 Neb. 703, 824 N.W.2d 668 (2012).

until the case reaches the appellate level. A defendant might raise that "error" in its brief on direct appeal, or this court might note it on its own motion.[7] But in this case, the perceived error was initially raised at the trial court level in a motion for new trial. The motion for new trial was denied because of the lack of an objection at trial. The district court declined McSwine's invitation to find plain error.

We ordinarily review the denial of a motion for new trial for an abuse of discretion, and we cannot conclude that the district court abused its discretion in denying the motion for new trial. Indeed, everyone agrees that no objection was made to the prosecutor's statements at trial.

But this does not end our inquiry, because the Court of Appeals concluded that the prosecutor's statements during closing arguments constituted, as a matter of plain error, prosecutorial misconduct. We therefore turn to an analysis of whether that conclusion was correct.

*Relevant Propositions of Law.*

[3-5] When considering a claim of prosecutorial misconduct, we first consider whether the prosecutor's acts constitute misconduct.[8] A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[9] But if we conclude that a prosecutor's acts were misconduct, we next consider whether the misconduct prejudiced the defendant's right to a fair trial.[10]

[6-8] Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process.[11] Whether prosecutorial misconduct is prejudicial depends largely on

---

[7] See *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003).

[8] *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

[9] *Id.*

[10] *Id.*

[11] *Id.*

the context of the trial as a whole.[12] In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction.[13]

*Were Statements Misconduct?*

We turn first to the conclusion of the Court of Appeals that the prosecutor's statements were misconduct. We conclude that the statements were not misleading and did not unduly influence the jury. As such, they were not misconduct.

The statements at issue were related to McSwine's defense at trial that his text messages were not referring to C.S.' sexual assault allegations, but instead were related to a trespassing incident that McSwine was involved in earlier that same day. The State, in discussing that defense, noted there was no evidence "at all," beyond McSwine's word, of this earlier incident. As has been noted, McSwine did not object to these statements. Only after the jury returned a verdict against McSwine did he complain, via a motion for new trial, that these statements were misleading.

The Court of Appeals concluded that the prosecutor's closing statements were misleading. The court reasoned that the statements did not limit the term "evidence" to only that evidence presented at trial; rather, the statements suggested to the jury that there was no evidence "at all," when there was evidence to support McSwine's statements.[14] However, that evidence was not offered at trial.

---

[12] *Id.*

[13] *Id.*

[14] *State v. McSwine, supra* note 1.

There were police reports about the incident, which had been forwarded to McSwine's counsel by the State. At that time, the State indicated that it would not offer evidence of the incident at trial. According to McSwine, this showed that the State was aware of evidence relating to the trespassing incident and that therefore, the prosecutor's statement that there was no evidence "at all" regarding the incident was misleading.

[9,10] We agree that the State had knowledge of these reports. Despite this knowledge, we cannot conclude that the jury was misled or unduly influenced by the prosecutor's closing argument, because the jury was well instructed as to what "evidence" was within the context of this trial. A prosecutor must base his or her argument on the evidence introduced at trial rather than on matters not in evidence.[15] A fact finder can rely only on evidence actually offered and admitted at trial and is not permitted to rely on matters not in evidence.[16] It is undisputed that there was no evidence presented at trial which corroborated McSwine's testimony about the trespassing incident.

The jury was informed at various times and in various ways of what it could consider in reaching its determination. Just prior to closing statements, the jury was told that "[t]he attorneys, in making these arguments, will be commenting upon the testimony you have heard and the evidence that has been presented during the trial."

During the jury's formal instructions, instruction No. 1 informed the jury that it "is your duty to decide what the facts are" and that "[i]n determining what the facts are you must rely solely upon the evidence in this trial and that general knowledge and common sense that everyone has."

In instruction No. 10, the jury was further instructed: "The evidence from which you are to find the facts consists of the

---

[15] See *State v. Pierce,* 231 Neb. 966, 439 N.W.2d 435 (1989).

[16] See *Turner v. Louisiana*, 379 U.S. 466, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965).

following: (1) The testimony of the witnesses; (2) the exhibits received in evidence; and (3) any facts that have been stipulated . . . ." That same instruction also specifically informed the jury that "[s]tatements, arguments and questions" were not evidence.

During its deliberations, the jury asked the court if the prosecutor had said that there was no evidence, "including a police report," of the trespassing incident in Eagle. But in a supplemental answer to the question, the jury was informed that "[y]ou have all of the evidence you are going to receive in this case." That answer also specifically referred the jury back to instruction No. 10, which provides in part that arguments of counsel are not evidence.

[11,12] "The purpose of jury instructions is to assure decisions that are consistent with the evidence and the law"[17] and "to inform the jury clearly and succinctly of the role it is to play, the decisions it must make, and to assist and guide the jury in understanding the case and considering testimony."[18] Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.[19]

In this case, the jury was instructed in various ways that the only evidence it was to consider was that which was presented at trial. It seems incongruous to instruct the jury that "evidence" means the evidence presented at trial and simultaneously find the prosecutor commits misconduct if he does not qualify references to "evidence" to make sure the jury understands he means only the "evidence" presented at trial. This is particularly so when McSwine did not object at trial and instead raised the issue of misconduct only after learning of the jury's verdict. We therefore conclude that the jury was not misled or unduly influenced by the prosecutor's failure to qualify his references to evidence as being the evidence

---

[17] 89 C.J.S. *Trial* § 718 at 192 (2012).

[18] 23A C.J.S. *Criminal Law* § 1760 at 330 (2006).

[19] *State v. Smith*, 286 Neb. 856, 839 N.W.2d 333 (2013).

presented at trial, or his statement that there was no evidence "at all" to corroborate McSwine's testimony.

*Were Statements Prejudicial?*

We conclude that the prosecutor's statements were not misconduct. But even if they were, those statements were not so prejudicial as to violate McSwine's due process rights. In making that determination, a court considers (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction.[20]

We turn first to the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury. We find this weighs against finding prejudice. As noted in detail above, the statements made by the prosecutor did not mislead or unduly influence the jury to any significant "degree," because the jury was well instructed as to what it could consider in its deliberations. The jury was aware it could consider only that evidence which was presented at trial and that the arguments of counsel were not evidence.

We further note that in the motion for new trial, even McSwine's counsel averred that he did not object because he "believed [that the prosecutor] argued that no evidence, other than [McSwine's] testimony, was 'presented at trial' about a trespassing in Eagle, Nebraska." Counsel explained that his failure to object was because he "misheard" the prosecutor.

The second factor is whether the conduct or remarks were extensive or isolated. As an initial matter, having reviewed the entirety of closing arguments, we observe that these mentions were brief in the context of a much longer closing argument. The remarks consisted of perhaps 30 seconds out

---

[20] *State v. Dubray, supra* note 8.

of nearly 45 minutes' worth of the State's closing and rebut-
tal arguments.

Moreover, when the State's closing arguments are consid-
ered collectively with its cross-examination of McSwine, it
seems clear that the State did not strongly contest McSwine's
story regarding the trespassing incident in Eagle, but only
questioned his explanation that it was that incident to which
the text messages referred:

[State:] And you run — I believe you indicated that
you run [sic] into a house?

[McSwine:] Yes. I ran through a house.

Q Where is your car at?

A If the house is here and the parking lot is here, my
car is here.

And we met on the side of the house, here.

So, I backed out and I ran through the house and came
around the block to the parking.

Q How long were you in this house?

A Twenty — 20 seconds, maybe 30 seconds.

Q So, your testimony is that you did not enter this
house for the purpose of stealing anything or anything
like that, right?

A Absolutely not.

Q You just went into this house so that you could lose
this guy that you thought was following you?

A Correct.

Q And you encountered people in the house?

A Yes.

Q And I believe that you kind of gestured like this, you
put your hands up and got out of there, right?

A Yes.

Q So, there's no reason to believe that these people
thought you were in there for the purpose of stealing any-
thing or like — anything like that, right?

A Well, I can't, you know, intelligently tell you what
they were thinking or what they feel, I mean that's crazy.

Q But you had no permission to go in the house.

A No.

Q Did you say anything to the people that were in the house?

A I told the lady I'm just passing through. She looked scared. I felt bad.

Q Did this guy [you were supposed to be selling marijuana to] that you don't know the name of, did he follow you into the house?

A No. I paused, briefly, to see if he was giving chase, and he was not.

Q And is it your testimony that going into this house was the only way in which to get away from this guy?

A Maybe not the only way, but I felt it was a — clever, at the time.

Q All right. So, you get to your car after this, right, and then — Where do you go from there?

A From that car, I went to [C.S.'] house.

During the prosecution's closing argument, in the context of discussing McSwine's explanation for the text messages, it noted: "[B]y the way, [the story was] unsupported by any evidence at all." The prosecutor then continued, "[w]hen was the last time a federal agent had to go get somebody for a simple trespassing? He's talking about raping [C.S.]"

In its rebuttal closing argument, the prosecution again suggested that McSwine's explanation for those text messages just did not make sense:

I would submit to you that the timing of this, these text messages, is extremely compelling as to what he's talking about and what he's referring to. His statements are only that. There is nothing that supports his statement or his testimony that he ran through some house in Eagle, nothing. It's just his word.

When considered collectively and not in isolation, the crux of the State's argument was not that the trespassing event did not take place; rather, the crux of the argument was that

McSwine's explanation that this event caused him to send those text messages did not make sense. As such, we conclude that the second factor weighs against a finding of prejudice.

We turn next to the third factor, whether defense counsel invited the error.

Our review of the record suggests that in his closing argument, McSwine's counsel noted that there was, in evidence, a picture of McSwine taken from security footage at a convenience store in Eagle. Defense counsel then noted: "Why does law enforcement go into [a convenience store] looking for surveillance video of someone? Why? It only makes sense [if] it's because there's been a call about a trespass, somebody entering the house, and that's why they're going there."

But there was no evidence at trial that any police call regarding the trespass was made. It appears that defense counsel invited the jury to consider evidence outside of trial. This arguably invited the State to clarify, during its rebuttal argument, that there was nothing except McSwine's word to support his trespass story. We conclude there was reason to believe that the error was invited. This factor also weighs against finding prejudice.

The fourth factor is whether the court gave any curative instruction. In this case, McSwine did not object to the statements and, as such, did not request a curative instruction or a mistrial based on these statements. But the instructions the jury received prior to deliberations did address what the jury was to consider in reaching its decision, and after the jury asked its question, these instructions were reiterated. At most, this factor is neutral.

The final factor is the strength of the evidence supporting McSwine's convictions, and in this case, such evidence is strong. C.S. testified that McSwine abducted and sexually assaulted her at knifepoint. C.S. also testified that she had known McSwine because she frequented a local convenience store where he worked and because he had once used the bathroom in her apartment. A friend of McSwine's also testified

that McSwine told him that he had abducted and sexually assaulted C.S. at knifepoint. The physical evidence, notably the laceration to C.S.' vagina, also supported the conclusion that a sexual assault had occurred.

Moreover, the circumstances surrounding the incident do not support the conclusion that the sexual contact between C.S. and McSwine was consensual. Both agree that C.S. was wearing little by way of clothing and left her apartment without shoes, a cell phone, money, or her identification. The parties also both agree that the sexual contact occurred in isolated and remote areas of Lancaster County, requiring C.S. to walk barefoot through coarse vegetation and over rocky earth.

Having considered the above factors, we conclude that even assuming the prosecutor's statements were misconduct, such statements were not prejudicial.

We also note that certainly the prosecutor's statements did not amount to plain error, and we determine that the Court of Appeals erred in finding otherwise.

[13,14] Under most circumstances, we require a party to object to a perceived error by a trial court in order to preserve that issue for appeal.[21] A party is not permitted, without objection, to take the chances of a favorable result and then, if disappointed, for the first time complain.[22] Conversely, plain error may be found on appeal when an error is unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.[23]

Plain error should be resorted to only in those rare instances where it is warranted; to conclude otherwise would swallow the general rule. In short, a party is not permitted a second

---

[21] See *State v. Collins*, 281 Neb. 927, 949, 799 N.W.2d 693 (2011).

[22] *Id.*

[23] *State v. Alarcon-Chavez, supra* note 5.

bite at the apple. And plain error certainly is not a vehicle that should be routinely used to "save" an issue for appeal where a proper objection should have been, but was not, made at trial.

We do not, as the dissent suggests, conclude that a district court cannot, on a motion for new trial, consider whether a prosecutor's statement was plain error. In fact, the district court considered plain error here and ultimately found none. We simply take issue with the Court of Appeals' finding of plain error in this case for two reasons. First, there was no error to form the basis for plain error. And second, the Court of Appeals' finding that trial counsel's performance was ineffective independently supports the ultimate conclusion without relying on the plain error doctrine.

We pause to note that because the jury was both properly instructed and repeatedly instructed, we do not find misconduct or prejudice. But statements like those made in this case could impermissibly lead the jury to consider information not contained in the record. On different facts, these statements could lead to a conclusion that the prosecutor committed misconduct.

[15,16] We therefore remind the State that public prosecutors are charged with the duty to conduct criminal trials in such a manner that the accused may have a fair and impartial trial.[24] As explained by the U.S. Supreme Court, a prosecutor

is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.[25]

---

[24] *State v. Barfield*, 272 Neb. 502, 723 N.W.2d 303 (2006), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

[25] *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).

"It is as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."[26] Because the "average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed," "improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."[27] Beyond the reversal of a defendant's criminal conviction, the State's failure to comply with this duty could result in discipline by this court.[28]

*Was Trial Counsel Ineffective?*

In addition to concluding that the prosecutor's statements during closing arguments were plain error, the Court of Appeals concluded that McSwine's trial counsel was ineffective for failing to object to those statements when they were made. We disagree.

[17] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[29] the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.[30]

As we have noted above, the prosecutor's statements, when considered in the context of all the trial proceedings, were not misleading and did not unduly influence the jury and, thus, were not misconduct. Counsel cannot be deficient for failing to object to statements which were not misconduct. Moreover, as the above analysis shows, McSwine was not prejudiced by

---

[26] *Id.*

[27] *Id.*

[28] See Neb. Ct. R., ch. 3, art. 3.

[29] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[30] *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015).

counsel's performance. We conclude that the Court of Appeals erred in finding otherwise.

## CONCLUSION

We reverse the Court of Appeals' decision reversing McSwine's convictions. We remand the cause to the Court of Appeals for consideration of any remaining assignments of error.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

STACY, J., not participating.

CONNOLLY, J., dissenting.

I dissent. I disagree with the majority for two reasons. First, the issue presented by McSwine's motion for a new trial was whether the prosecutor's closing argument was plain error. McSwine conceded that his attorney did not object but raised plain error in the proceedings. The trial court stated that even if it could consider plain error in a motion for a new trial, it found none. But because McSwine did not object, the majority concludes that the trial court did not abuse its discretion in overruling his motion for a new trial. In effect, the majority concludes that a trial court has no inherent duty or statutory duty under Neb. Rev. Stat. § 29-2101(1) (Reissue 2008) to consider whether plain error from prosecutorial misconduct occurred during a trial. I disagree.

Second, I disagree with the majority that the prosecutor's false statements of fact were not misconduct and that the Nebraska Court of Appeals incorrectly held the prosecutor's closing argument was plain error. I believe it is always misconduct for a prosecuting attorney to knowingly make false statements of fact in a case, whether the court admitted the evidence or not. And because the false statements were crucial to McSwine's only defense and made when McSwine could not rebut them, I agree with the Court of Appeals that the prosecutor's misconduct was plain error.

TRIAL COURTS HAVE A STATUTORY DUTY
TO CONSIDER A CLAIM OF PLAIN ERROR
IN A MOTION FOR A NEW TRIAL
UNDER § 29-2101(1)

Section 29-2101, in relevant part, authorizes a trial court to grant a defendant a new trial for one of seven listed reasons if the asserted reason materially affected the defendant's substantial rights. Section 29-2101(1) authorizes a new trial for one of four disjunctive irregularities in the proceedings if they prevented a defendant from having a fair trial: an "[i]rregularity in [1] the proceedings of the court, [2] *of the prosecuting attorney*, *or* [3] of the witnesses for the state *or* [4] in any order of the court or abuse of discretion *by which the defendant was prevented from having a fair trial*." (Emphasis supplied.)

An irregularity in a prosecuting attorney's proceedings is listed separately from an irregularity or abuse of discretion in a court order or ruling. So on its face, § 29-2101(1) contemplates raising the prosecutor's misconduct apart from any claimed irregularity in a court order or ruling. And because any irregularity under § 29-2101(1) must be one that deprived the defendant of a fair trial, a valid claim of irregularity is one that affected a defendant's substantial rights.

As we know, plain error exists when there is error, plainly evident from the record but not complained of at trial, that prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[1] An irregularity that deprives a defendant of a fair trial is one that, left uncorrected, necessarily results in a miscarriage of justice. The Due Process Clause guarantees a defendant a fair trial, and prosecutorial misconduct can deprive a defendant of that right.[2]

---

[1] See, e.g., *State v. Kays*, 289 Neb. 260, 854 N.W.2d 783 (2014).

[2] See *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

So § 29-2101(1) provides a defendant a statutory remedy to raise prosecutorial misconduct that rises to the level of a due process violation. And McSwine did not waive his right to a fair trial by his attorney's failure to object to prosecutorial misconduct.

A waiver is the voluntary and intentional relinquishment of a known right, privilege, or claim. Although it can be demonstrated by a person's conduct in some circumstances, an appellate court will generally not find a waiver of a right constitutionally guaranteed or statutorily granted unless the record shows that a defendant affirmatively waived the right.[3] But that is not the case here.

In McSwine's motion for a new trial, his attorney alleged that after an initial investigation of the trespass, a deputy sheriff interviewed the victims in their home and told them that they might have to testify. But before a rule 404(3)[4] hearing, the prosecutor informed McSwine's attorney that he would not present evidence of the trespass McSwine committed in Eagle. McSwine's attorney further alleged that during closing argument, McSwine complained to his attorney that the prosecutor lied when he said there was no evidence that McSwine had run through a house in Eagle. At the time, McSwine's attorney incorrectly believed the prosecutor had argued there was no evidence presented at trial about the trespass. But after the trial, his attorney ordered a transcript and reviewed it. His attorney then moved for a new trial. These facts do not show a voluntary waiver of McSwine's claim of prosecutorial misconduct, and certainly not of his right to a fair trial. But the majority's reasoning will allow trial courts to conclude that in considering a motion for a new trial, a defense counsel has forfeited a defendant's right to a fair trial if the defense counsel failed to object to prosecutorial misconduct.

---

[3] *State v. Qualls*, 284 Neb. 929, 824 N.W.2d 362 (2012).

[4] See Neb. Evid. R. 404(3), Neb. Rev. Stat. § 27-404(3) (Cum. Supp. 2014).

I do not agree with that reasoning. In a previous appeal rais-
ing a trial court's denial of a motion for a new trial, we con-
sidered whether the prosecutor's alleged misconduct in closing
argument was plain error without implying that the trial court
had no duty to consider that argument because the defense
counsel failed to object.[5] More important, we have specifically
held that a trial court has the inherent power and discretion
to grant a new trial because of plain error.[6] This power would
often be of little use if trial courts were free to ignore a mis-
carriage of justice because a party failed to object. Federal
courts similarly hold that under Fed. R. Crim. P. 33 ("[u]pon
the defendant's motion, the court may vacate any judgment
and grant a new trial if the interest of justice so requires"), a
trial court has broad power to correct a miscarriage of justice,
including prosecutorial misconduct, subject to the plain error
doctrine if the defendant did not object.[7]

So I disagree with the majority's conclusion that a trial court
cannot consider plain error if the defendant failed to object at
trial. That conclusion is contrary to § 29-2101 and our case
law. In my opinion, the issue is whether the trial court erred in
failing to determine that the prosecutor's closing argument was
plain error.

## PROSECUTOR'S FALSE STATEMENTS WERE MISCONDUCT

### Closing Arguments and Relevant Facts

The prosecutorial misconduct claim involves two different
statements that the prosecutor made in closing arguments. In

---

[5] See *State v. Barfield*, 272 Neb. 502, 723 N.W.2d 303 (2006), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

[6] See *McCready v. Al Eighmy Dodge*, 197 Neb. 684, 250 N.W.2d 640 (1977). See, also, *Balames v. Ginn*, 290 Neb. 682, 861 N.W.2d 684 (2015).

[7] See, e.g., *U.S. v. McBride*, 862 F.2d 1316 (8th Cir. 1988); 3 Charles Alan Wright & Sarah N. Welling, Federal Practice and Procedure: Federal Rules of Criminal Procedure §§ 581, 588 (4th ed. 2011).

the State's initial argument, the prosecutor emphasized that some of McSwine's text messages to his wife or a friend were made after he had let the complaining witness out of the car. He argued that when McSwine sent messages that he was in big trouble for something that he had done, it was implausible that he was referring to "some simple trespassing where he walked through somebody's house, which is, by the way, *unsupported by any evidence at all. It's just him saying that that happened*." (Emphasis supplied.) He then referred to McSwine's statements that he might have to go to Mexico or "the reservation" because the cops would be looking for him and only federal marshals could go onto a reservation. The prosecutor argued that it was implausible that federal marshals would go after someone on a reservation for a trespass, which showed that McSwine really meant he was in trouble for raping the complaining witness.

In McSwine's closing argument, his attorney first said that the prosecutor "has said a lot of things. Some things that maybe I hadn't prepared for. I'll do my best to address those." McSwine's defense was that the complaining witness was not credible, because she had lied or omitted facts during the investigation, and that his claim they had consensual sex was credible despite his text messages. In arguing that his text messages were about his parole violations—including the trespass in Eagle—he reminded the jurors of a photograph of McSwine from Casey's convenience store in Eagle. He asked the jurors to consider why officers would have gone there looking for a surveillance video when Casey's had no connection to any of the alleged sexual crimes: "Why? It only makes sense [if] it's because there's been a call about a trespass, somebody entering the house, and that's why they're going there. And then, Lancaster County deputies see this and they say, I — we know that guy, we know him from Ollie's."

To put this argument in context, the evidence showed that the complaining witness knew McSwine from her contacts with him at Ollie's gas station in Waverly, where he had previously

worked. A deputy sheriff, who had seen McSwine at Ollie's several times, identified him in a photograph taken at Casey's in Eagle on the morning of October 13, 2012. The deputy sheriff testified that McSwine was at Casey's about 7 a.m. and about 8:15 a.m. that day.

McSwine testified that he was in Eagle on October 13, 2012, to sell marijuana to two people: someone he knew and a friend of that person whom he did not know. He said he smoked methamphetamine with the person he knew and that they then went to Casey's about 7 a.m. He said that after visiting a former employer in Eagle, he returned to Casey's before going to a used car lot, where he had arranged to meet the second buyer. McSwine said the second buyer appeared nervous, causing him to fear that he was about to be robbed. So he punched the buyer and ran into a nearby house where he had seen an elderly man leaving through the back door. Inside the house, he was confronted by an elderly woman. McSwine said that when he ran out the front door, he did not see the second buyer and left in his car.

In response to McSwine's closing argument, the prosecutor emphatically argued that his claim about his text messages referring to a trespass in Eagle was implausible:

> I would submit to you that the timing of this, these text messages, is extremely compelling as to what he's talking about and what he's referring to. His statements are only that. *There is nothing that supports his statement or his testimony that he ran through some house in Eagle, nothing.* It's just his word. And you have to apply the same factors to . . . McSwine that you do [to a witness who testified against McSwine]. He's a convicted felon. He was violating his parole all over the place.

This argument was obviously intended to persuade the jurors that McSwine was lying about the trespass, and the reason for the trespass, because there were no facts showing that a trespass occurred. But the prosecutor knew otherwise.

### Prosecutor's Statements
### Were Misleading

Prosecutors have a duty to conduct criminal trials in a manner that provides the accused with a fair and impartial trial.[8] A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[9] It follows that conduct which does mislead the jury is misconduct.[10]

I believe that the majority erroneously concludes that the prosecutor's false statements were not misconduct because they were not misleading and did not influence the jury. To reach that conclusion, the majority relies on the court's general admonitions that (1) the attorneys' arguments are not evidence; (2) the jury must rely solely on the evidence presented; and (3) evidence consisted of testimony, admitted evidence, and stipulated facts. I do not agree that general admonitions to the jury that arguments are not evidence can cure a prosecutor's false statements of fact.[11]

> A prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."[12]

Because the "'average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed,' 'improper suggestions, insinuations and, especially, assertions of personal

---

[8] *Dubray, supra* note 2.

[9] *Id.*

[10] See, *id.*; *State v. Alarcon-Chavez*, 284 Neb. 322, 821 N.W.2d 359 (2012). Accord, e.g., *U.S. v. Myerson*, 18 F.3d 153 (2d Cir. 1994).

[11] See *Clark v. Doe*, 119 Ohio App. 3d 296, 695 N.E.2d 276 (1997).

[12] *Barfield, supra* note 5, 272 Neb. at 512, 723 N.W.2d at 312-13, quoting *Berger v. United States*, 295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).

knowledge are apt to carry much weight against the accused when they should properly carry none.'"[13]

"[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."[14] "For this reason, it is improper for the government to present to the jury statements or inferences it knows to be false or has very strong reason to doubt."[15]

It is true that the prosecutor's argument was not misleading because it was based on *admitted* evidence. Instead, the prosecutor's false statements were misleading because they conveyed to the jury that McSwine was not credible based on the prosecutor's knowledge of the *available* evidence. A lie, by definition, is a false statement made with the intent to mislead, and a knowing false statement of fact can never be consistent with a prosecutor's duty to do justice. It is precisely because jurors believe that the prosecutor has knowledge of the relevant facts—admitted or not—that prosecutors have a duty to be truthful in their statements, especially in closing arguments.

Accordingly, a prosecutor cannot misstate the record,[16] state facts not in evidence,[17] or suggest that there are facts not in evidence that are favorable to the State.[18] "By going beyond the record, the prosecutor becomes an unsworn witness, engages in extraneous and irrelevant argument, diverts the jury from its proper function, and seriously threatens the

---

[13] *Id.* at 512, 723 N.W.2d at 313, quoting *Berger, supra* note 12.

[14] *United States v. Young*, 470 U.S. 1, 18-19, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).

[15] *U.S. v. Reyes*, 577 F.3d 1069, 1077 (9th Cir. 2009).

[16] See Bennett L. Gershman, Prosecutorial Misconduct § 11:30 (2d ed. 2015) (citing cases).

[17] See Doug Norwood, Prosecutorial Misconduct in Closing Argument § 15.1 (2014) (citing cases).

[18] *Id.*, § 15.3 (citing cases). See, also, *Dubray, supra* note 2.

defendant's right to a fair trial."[19] And a prosecutor's duty to be truthful in his or her statements to the jury extends to not making false statements about the known but unadmitted facts of the case.

Both federal and state courts have held that a prosecutor's knowing false statements of fact were misconduct, even if the known contrary facts were not admitted in evidence. Some of these cases were cited in McSwine's brief. But because it appears the majority is unconcerned with other courts' reasoning, I discuss cases relevant to show that the Court of Appeals' decision was correct.

For example, the Ninth Circuit considered a case in which the government charged the defendant with falsifying corporate books by conspiring to compensate employees with stock options that were backdated but not recorded as a compensation expense.[20] The accounting violation made the publicly traded corporation appear more profitable than it was. The defendant testified that he had no intent to deceive and had relied on the finance department's statements to ensure that the books were accurate. A low-level employee in the finance department testified that she and other employees did not know about the backdating scheme. But both the defense and the government knew that higher-level employees in the department, who did not testify, had admitted their knowledge of the backdating procedures and had themselves been targets of investigations.

In closing argument, to support the defendant's position that he was not responsible for the misstatements, he argued that the finance department knew about the backdating procedures. The prosecutor responded by arguing that the employees in the finance department had no knowledge of the backdating scheme. The trial court denied the defendant's motion for a new trial because the defense counsel had told the jury that

---

[19] Gershman, *supra* note 16, § 11:32 at 591 (citing cases).

[20] *Reyes, supra* note 15.

there were finance department employees who knew about the backdating procedures without seeking their immunity and calling them as witnesses.

The Ninth Circuit rejected this reasoning because the "[d]efense counsel made no knowingly false statements."[21] Conversely, the prosecutor, who had the burden to prove guilt, had "asserted as fact a proposition that he knew was contradicted by evidence not presented to the jury."[22] The court emphasized that it would not lightly tolerate a prosecutor's false statements because such arguments "harm the trial process and the integrity of our prosecutorial system."[23] And the false statements were particularly prejudicial because they struck directly at the defendant's main defense: that he had delegated the backdating responsibility, the finance department knew how it was being done, and he had relied on its statements. The court reversed the conviction and remanded the matter for a new trial. As in this case, the prosecutor knew that his statements were false even if the contrary evidence was not received as part of the record.

The First Circuit reached the same conclusion in *U.S. v. Udechukwu*.[24] There, the government accused the defendant of being a drug courier from Nigeria, and the evidence clearly established the elements of the crime. But her defense was duress, i.e., that she was forced to carry drugs by a man who had threatened her and her family. She had given the prosecutor the man's hotel telephone number and offered to participate in a controlled delivery. The government had used her information to verify the man as a drug trafficker in Aruba, and the prosecutor informed the defense attorney that government agents had been tracking him for some time. Yet at trial, the government disclosed neither the man's name nor his

---

[21] *Id.* at 1077.

[22] *Id.* at 1076.

[23] *Id.* at 1078.

[24] *U.S. v. Udechukwu*, 11 F.3d 1101 (1st Cir. 1993).

existence. In closing argument, the prosecutor questioned the existence of the man and strongly suggested that the defendant's story was unbelievable. The First Circuit concluded that the prosecutor had committed two errors: (1) failing to give the defendant salient evidence and (2)

> a deliberate insinuation that the truth is to the contrary. As we [have previously] pointed out . . . "it [is] not improper to urge the jury to evaluate the plausibility of the justification defense in light of the other evidence (and the lack thereof)," but "it is plainly improper for a prosecutor to imply reliance on knowledge or evidence not available to the jury." *It is all the more improper* to imply reliance on a fact that the prosecutor knows to be untrue, or to question the existence of someone who is known by the prosecution to exist.[25]

Again, the court's conclusion that the prosecutor's false statements were misconduct did not depend on whether the government had admitted the contrary available evidence.

The Sixth Circuit's reasoning in *United States v. Toney*[26] also supports McSwine's argument that the prosecutor's false statements were misconduct. In that case, the government prosecuted the defendant for bank robbery. Three masked men robbed a bank, and no witness could positively identify the third man. But a search of the defendant's residence uncovered a nylon stocking mask and "bait money" that had been placed in the money stolen from the bank.[27] The defendant admitted to the FBI that he planned the robbery but claimed that he had backed out the day before and did not participate. He said he won the money playing poker with his replacement in the robbery and other men. The replacement robber had told investigators that he gambled with the defendant after the robbery and that the defendant won a substantial sum. But

---

[25] *Id.* at 1106 (citation omitted) (emphasis supplied).

[26] *United States v. Toney*, 599 F.2d 787 (6th Cir. 1979).

[27] *Id.* at 788.

the government did not make this statement available to the defense until the last day of the trial and successfully objected to the statement as hearsay when the defendant sought to introduce it. In response to the defendant's testimony, the government also presented counterwitnesses, one of whom stated that the replacement robber had not been present during the gambling; the other stated that the defendant had lost money. In closing argument, the prosecutor attacked the defendant's credibility and suggested the defendant was unbelievable because no witness testified that the replacement robber was gambling with the defendant.

In determining that the government's violation of *Brady v. Maryland*[28] was not harmless, the Sixth Circuit focused on this closing argument:

> In the circumstances, we find this line of argument to be foul play. As he was making the argument, the prosecutor well knew that evidence did exist to corroborate [the defendant's] story in this regard and that it had come from [the replacement robber] himself. Moreover, the nature of the closing argument forecloses any possible claim that the exclusion of the [replacement robber's] statement could have been harmless error. The prosecutor told the jury that it should convict because of the absence of evidence which he knew existed. We have no choice but to assume that the jury was persuaded by the prosecutor's remarks and convicted for that reason.[29]

None of these federal courts were concerned with whether the government submitted the available contrary evidence. And state courts' decisions are consistent with these federal cases. In *Garcia v. State*,[30] the Florida Supreme Court reversed a trial court's denial of postconviction relief and vacated the

---

[28] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[29] *United States v. Toney, supra* note 26, 599 F.2d at 790-91.

[30] *Garcia v. State*, 622 So. 2d 1325 (Fla. 1993).

defendant's convictions and sentences because the State had withheld evidence relevant to the defendant's death sentence and the prosecution's closing argument was contrary to the evidence that the State had withheld. The defendant was one of four participants in a robbery in which the two storeowners were killed. After he was arrested, the defendant twice told investigators that another participant had shot the owners. In the first statement, the defendant gave a false name for the shooter, who had apparently assumed someone else's name. But in the second statement, he clarified that the name he had given was another name for the shooter and gave the shooter's real name. Additionally, a witness who turned in the alleged real shooter said that he initially gave officers the false name when they arrested him, but the State withheld the witness' statement from the defense counsel.

The Florida Supreme Court concluded that the evidence did not support the prosecutor's argument that the fictional name (Joe Perez) referred to a fictional person and that the "*available evidence*" showed the opposite was true.[31] "For the State prosecutorial team to argue on this record that Joe Perez was a nonexistent person created by [the defendant] during questioning constitutes an impropriety sufficiently egregious to taint the jury recommendation."[32] The court stated that "while the State is free to argue to the jury any theory of the crime that is reasonably supported by the evidence, it may not subvert the truth-seeking function of the trial by obtaining a conviction or sentence based on deliberate obfuscation of relevant facts."[33]

Finally, in *State v. Bvocik*,[34] the prosecution charged the defendant with using a computer to facilitate meeting an

---

[31] *Id.* at 1331 (emphasis supplied).

[32] *Id.* at 1332.

[33] *Id.* at 1331.

[34] *State v. Bvocik*, 324 Wis. 2d 352, 781 N.W.2d 719 (Wis. App. 2010).

underage girl for sex. The State had to prove that he only had reason to believe the correspondent, who was actually a 28-year-old woman, was under age 16. Her profile on a Web site stated that she was age 28 but that she was into "'age-play.'"[35] The government did not present the woman's true age to the jury, and she did not testify. She had elicited the defendant's interest in sex acts. Then at some point, she got nervous and told him that she was age 14. She contacted the police when he still wanted to meet with her. An officer testified that she was brought to his office at a high school where he was the police liaison. The defendant claimed that he did not really believe she was underage because of her graphic descriptions of her sexual experiences. In closing argument, the prosecutor suggested that the woman's listed birth date (February 14, 1977) was untrue and obviously suspicious because it was Valentine's Day—despite knowing that her birth date was accurate.

The appellate court reversed. It stated that under Wisconsin law, when a prosecutor asks a jury to draw an inference that the prosecutor knows or should know is not true, it is improper argument that may require reversal. The court explained that this type of argument could be highly prejudicial because the defense has no opportunity to present rebuttal evidence. Additionally, during deliberations, the jury submitted a question to the court. It wanted to know the correct age of the "girl" in question. The court concluded that this question showed the prosecutor's argument had its intended effect. The transcript of the Web site conversation and the officer's testimony that he brought her to a high school increased the plausibility of the prosecutor's suggestion that the woman was actually age 14. If the woman's true age had been part of the record, then the suggestion would likely not have required a reversal. But the prosecutor's suggestion diverted the jury

---

[35] *Id.* at 354, 781 N.W.2d at 721.

from the real issue, which was only whether the defendant had reason to believe the woman was underage.

These cases show that courts should not tolerate prosecutors' making false arguments to a jury that are contrary to the known facts of the case—whether presented or not. That conclusion should be obvious and is consistent with our holdings on fraudulent misrepresentations in civil cases, which include half-truths intended to deceive:

> "When a party makes a partial or fragmentary statement that is materially misleading because of the party's failure to state additional or qualifying facts, the statement is fraudulent. 'Fraudulent misrepresentations may consist of half-truths calculated to deceive, and a representation literally true is fraudulent if used to create an impression substantially false.' '"To reveal some information on a subject triggers the duty to reveal all known material facts."' Consistent with imposing liability for half-truths, the Restatement (Second) of Torts § 527 provides that an ambiguous statement is fraudulent if made with the intent that it be understood in its false sense or with reckless disregard as to how it will be understood."[36]

The same reasoning should certainly apply when a defendant's personal liberty is at stake. Yet the majority concludes that a prosecutor's false statements are not misconduct if the court admonishes the jurors to consider only the evidence and that arguments are not evidence. I do not think a prosecutor's duty to be truthful should hinge upon whether the jurors would have understood to ignore the prosecutor's false statements because of the court's admonition to consider only admitted "evidence." A heated argument is qualitatively distinct from false statements of fact. The prosecutor obviously intended

---

[36] *deNourie & Yost Homes v. Frost*, 289 Neb. 136, 150, 854 N.W.2d 298, 312 (2014).

to undermine McSwine's defense by asking the jurors to rely on his knowledge of the relevant facts. And the majority's reasoning will encourage, rather than discourage, prosecutorial misconduct.

Finally, I reject the majority's conclusion that McSwine's attorney invited the prosecutor's false statements. It is true that McSwine's attorney asked the jurors to infer that police officers had gone to Casey's and obtained his photograph because someone reported a trespass. He appears to have been responding to the prosecutor's unexpected argument that McSwine's trespass claim was unsupported by the evidence. But McSwine's attorney did not refer to evidence outside of the record or misstate the available evidence. Instead, he asked the jurors to draw a reasonable inference from the admitted evidence.

Even if McSwine's closing argument suggested there must be evidence outside the record, that suggestion only permitted the prosecutor to respond in kind, i.e., to go outside the record *truthfully*—not to falsely represent the known available evidence outside the record. Because the prosecutor knew there were facts to support McSwine's claim that he had committed crimes unrelated to the charged offenses, he could only argue that the defense had not presented such evidence. He could not argue that no evidence existed to support McSwine's defense when he knew otherwise.

Of course, having concluded that the prosecutor's false statements were not misconduct, the majority has no reason to consider whether they were prejudicial. But because McSwine's guilt was clearly tied to whether the jury believed the complaining witness had consented to the sexual acts underlying these charges, I believe McSwine was prejudiced by the prosecutor's false statements. The primary issue in this case was the witnesses' credibility. And the prosecutor's statements obviously raised the jurors' concerns over credibility or they would not have asked whether the prosecutor had said "there was no evidence (including a police report) of . . .

McSwine's presence in a local house in Eagle, NE?" Finally, the prosecutor's false statements were made when McSwine could no longer rebut them.

In sum, I do not agree that a court's general admonitions can cure a prosecutor's misrepresentations that directly undermine a defendant's primary defense. While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones."[37] False statements of fact are foul blows. So I think the Court of Appeals got it right. I would affirm the Court of Appeals' decision.

---

[37] *Berger, supra* note 12, 295 U.S. at 88.