Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/22/2016 09:09 AM CST

STATE OF NEBRASKA, APPELLEE, V.
MITCHELL Q. WYNNE, APPELLANT.
___ N.W.2d ___

Filed November 22, 2016.    No. A-15-840.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

2. **Rules of Evidence: Appeal and Error.** When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

4. **Motions for Mistrial: Appeal and Error.** The decision whether to grant a motion for mistrial is within the discretion of the trial court, and an appellate court will not disturb the ruling on appeal in the absence of an abuse of discretion.

5. **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

6. ____: ____. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

7. **Rules of Evidence: Telecommunications.** Generally, the foundation for the admissibility of text messages has two components: (1) whether the

text messages were accurately transcribed and (2) who actually sent the text messages.

 8. **Rules of Evidence.** Authentication or identification of evidence is a condition precedent to its admission and is satisfied by evidence sufficient to prove that the evidence is what the proponent claims.

 9. **Rules of Evidence: Identification Procedures.** Neb. Rev. Stat. § 27-901(1) (Reissue 2008) does not impose a high hurdle for authentication or identification.

10. **Rules of Evidence: Proof.** A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity.

11. **Rules of Evidence.** If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of Neb. Rev. Stat. § 27-901(1) (Reissue 2008).

12. **Hearsay.** A statement is not hearsay if the proponent offers it to show its impact on the listener and the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case.

13. **Trial: Prosecuting Attorneys: Appeal and Error.** When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct.

14. **Trial: Prosecuting Attorneys: Juries.** A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.

15. **Trial: Prosecuting Attorneys: Appeal and Error.** If an appellate court concludes that a prosecutor's acts were misconduct, the court next considers whether the misconduct prejudiced the defendant's right to a fair trial.

16. **Trial: Prosecuting Attorneys: Due Process.** Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process.

17. **Trial: Prosecuting Attorneys.** Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.

18. **Trial: Prosecuting Attorneys: Evidence.** A prosecutor must base his or her argument on the evidence introduced at trial rather than on matters not in evidence.

19. **Trial: Evidence.** A fact finder can rely only on evidence actually offered and admitted at trial and is not permitted to rely on matters not in evidence.

20. **Juries: Jury Instructions.** The purpose of jury instructions is to ensure decisions that are consistent with the evidence and the law, to

inform the jury clearly and succinctly of the role it is to play and the decisions it must make, and to assist and guide the jury in understanding the case and considering testimony.

21. **Verdicts: Juries: Jury Instructions: Presumptions.** Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict.

22. **Trial: Prosecuting Attorneys: Appeal and Error.** In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, an appellate court considers the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction.

Appeal from the District Court for Douglas County: Leigh Ann Retelsdorf, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Moore, Chief Judge, and Pirtle, Judge, and McCormack, Retired Justice.

Moore, Chief Judge.

## I. INTRODUCTION

Mitchell Q. Wynne appeals from his convictions in the district court for Douglas County following a jury trial for first degree murder and use of a deadly weapon (firearm) to commit a felony. On appeal, Wynne challenges the admission of a series of text messages into evidence, the denial of his motion for mistrial based on the prosecutor's comments during closing argument, and the sufficiency of the evidence to sustain the murder conviction. For the reasons set forth herein, we affirm.

## II. BACKGROUND

### 1. Charges

On January 29, 2014, the State filed an information in the district court, charging Wynne with one count of first degree murder, in violation of Neb. Rev. Stat. § 28-303(1) or (2) (Reissue 2008), a Class IA felony, and one count of use of a deadly weapon (firearm) to commit a felony, in violation of Neb. Rev. Stat. § 28-1205(1) (Cum. Supp. 2014), a Class IC felony. Specifically, the State alleged that on July 14, 2013, Wynne killed Darnell Haynes either purposely and with deliberate and premeditated malice or during the perpetration of or attempt to perpetrate a robbery, and that Wynne used a firearm to commit a felony.

### 2. Jury Trial

A jury trial was held on March 30 through April 3 and April 6 through 9, 2015. The record on appeal consists of over 2,000 pages of transcribed testimony and argument (1,360 pages of which contain the transcribed testimony of the State's 34 trial witnesses) and nearly 200 exhibits. We have reviewed this extensive record in its entirety and summarize those portions relevant to Wynne's arguments on appeal.

#### (a) Evidence About Wynne

At the time of the offense, Wynne was 17 years old and had just finished his junior year of high school. He resided in Omaha, Nebraska, with his parents and younger siblings; he also had an older brother. Wynne's mother testified that Wynne sometimes wore his hair in "single braids" and that it was "possible" he was wearing his hair that way during the summer of 2013. Wynne also had a girlfriend at that time.

Wynne's mother testified that on the morning of Sunday, July 14, 2013, she went to church with Wynne and his younger siblings. They left church around 12:15 or 12:20 p.m. and drove straight home. Wynne's mother testified that Wynne usually went to his girlfriend's house after lunch and that she

thought she drove him there on July 14 sometime between 1 and 2:30 p.m. When asked about the distance between Wynne's residence and the location of the murder, she testified that it was "maybe a six- or seven-minute drive" but might take an hour to walk. Wynne's girlfriend lived three blocks from Wynne's residence. When Wynne's mother dropped him off, Wynne's girlfriend was not home, but his mother testified that he went into the house to wait for her. Wynne's mother was uncertain when exactly she saw Wynne next, but she testified that he usually came home for dinner, which they eat sometime between 5 and 7 p.m. She did recall watching the news with him "later on," probably at 10 p.m., and seeing a news story about Haynes' death that evening, which was the first time she "knew anything about that happening." She also thought Wynne's girlfriend came back to the house with him and watched the news with them. Wynne's mother testified that she did not know Haynes or Haynes' mother, and she was not aware that Wynne ever had an acquaintance with or anything to do with Haynes. While watching the news story, she recalled that she and Wynne had seen Haynes and his vehicle (depicted in the news story) at a stoplight earlier in the day on their way home from church.

Wynne's girlfriend also provided a timeline for events occurring on July 14, 2013. That summer, she was working at a fast-food restaurant, and she testified that one of her parents picked her up from work around 3:20 or 3:30 p.m. on the day in question. They drove straight home, and on the way, they drove by a crime scene. She observed a red Jeep with "the passenger's side door open with white sheets hanging up" at the scene, but she did not recognize the vehicle. When she arrived at her house, her cousin and Wynne were there. When asked about the distance between her house and the location of the murder, Wynne's girlfriend testified that it was about a 10- or 15-minute drive and would be a "long walk." According to Wynne's girlfriend, after she returned home from work, she "sat around and watched movies" with Wynne and her

cousin and ate dinner around 5:30 or 6 p.m. She testified that her mother took her and Wynne to his house around 8 p.m. She recalled watching the 10 p.m. news with Wynne and his mother before her mother picked her up again around midnight. Wynne's girlfriend did not know Haynes and testified that she never knew Wynne to "hang out" with Haynes.

### (b) Evidence About Haynes

In July 2013, Haynes was 29 years old, and he lived in Omaha with his mother, his mother's husband, his brother, and two other children. Haynes, who was unemployed and receiving disability payments for epilepsy, supplemented his income by selling marijuana. That summer, Haynes regularly drove a red Jeep Cherokee (Jeep) owned by his mother. His mother testified that he washed the Jeep regularly and had probably washed it within the week prior to his murder. Haynes' mother did not know Wynne and had never seen Wynne at her residence or in the Jeep.

Haynes' mother provided testimony about his whereabouts in the hours preceding his murder. Haynes spent the night of July 13, 2013, away from home. He returned briefly the next day around 11 a.m. before leaving again. When Haynes returned again around 2 p.m. on July 14, his son and his son's mother were there for a visit. About 30 to 40 minutes later, Haynes told his mother that he was going to "make a run" and that he would "be right back" before he left in the Jeep. A "little after" 3 p.m., Haynes' brother told Haynes' mother that he had received a telephone call indicating that Haynes' vehicle had been located and that Haynes may have been shot.

### (c) Murder

At approximately 3:10 p.m. on July 14, 2013, Haynes was shot and killed in his Jeep, which was parked outside of a beauty supply store located at a particular intersection in Omaha. The beauty supply store was surrounded by several other business spaces, including a vacant one physically

connected to the east side of the beauty supply store, a fast-food restaurant located across the street west of the beauty supply store, and an automotive repair business and used car lot across the street north and east of the beauty supply store. There is a large parking lot on the north side of the beauty supply store and the vacant business space. The automotive business across the street was equipped with four exterior surveillance cameras, one of which was pointed in the direction of the beauty supply store parking lot. We have set forth an account of the murder, compiled primarily from surveillance video from the automotive repair business (taking into consideration testimony indicating that the time reflected on the video is 4 minutes 17 seconds ahead of "atomic time") and the testimony of a witness who was in the drive-through at the fast-food restaurant when the murder occurred. The witness in the drive-through was not able to discern facial features; nor is it possible to discern facial features from the surveillance video footage.

Shortly after 3 p.m., Haynes parked the Jeep in front of the beauty supply store, leaving the engine running. At approximately 3:08 p.m., two black men approached from the east, crossed the street curving along the northeast corner of the parking lot, and entered the parking lot near the vacant business space. The first man was wearing a white T-shirt and tan cargo shorts and had "cornrows or braids" in his hair. As the first man began walking across the parking lot toward the beauty supply store, the second man, trailing several feet behind, approached the garages attached to the vacant business space. The first man stopped briefly and looked back at the second man before continuing across the parking lot to the beauty supply store. The second man began walking slowly along the garages toward the beauty supply store.

At approximately 3:09 p.m., the first man walked around the back end of the Jeep and approached the front passenger-side door. Within a minute, he fired two shots, one of which struck Haynes in the forehead. The witness in the fast-food

drive-through heard the gunshots and immediately looked to her left toward the beauty supply store parking lot. She observed Haynes fall toward the open passenger-side door. She further observed the first man, who was standing outside the door, reach into the Jeep and then take off running. He fell to the ground behind the Jeep, but he rose quickly and continued running east toward the garages. The second man began running, and the two men ran around the corner by the eastern edge of the vacant business space and disappeared from view.

### (d) Evidence at Scene

Emergency personnel arrived on the scene on July 14, 2013, at approximately 3:22 p.m., followed by law enforcement at 3:23 p.m. They found Haynes lying face down across the front seat of the Jeep with his feet by the driver's-side door and his upper body slumped over the outer edge of the passenger's seat. There was a large amount of blood on the ground below his head, and small clumps of marijuana were found on the back of his T-shirt just below his neck and near his left armpit. His wallet was on the driver's seat and his cell phone was in the center console. Haynes did not have a pulse and was pronounced dead at the scene.

A search of the area surrounding the Jeep revealed (1) two .380-caliber shell casings (later determined to have been fired from the same gun) on the ground outside the passenger-side door, (2) several small clumps of marijuana on the ground outside the Jeep (both on the passenger's side and behind the Jeep), and (3) two small clumps of marijuana on the ground in front of the vacant business space (one clump near the beauty supply store and the other clump farther east, near the garages). No additional evidence was collected at the scene.

### (e) Autopsy and DNA Evidence

On July 15, 2013, Dr. Robert Bowen performed an autopsy on Haynes' body. Bowen observed a single gunshot wound on

the right side of Haynes' forehead. The condition of the wound indicated to Bowen that Haynes had been shot at very close range. Bowen retrieved a bullet from "just beneath [Haynes'] left ear" and concluded that Haynes died from the gunshot wound to the head.

At the time of the autopsy, a crime laboratory technician collected Haynes' personal effects. Thirty-five dollars in cash was recovered from Haynes' clothing. The technician also collected DNA swabs taken from Haynes' fingernails. Subsequent tests performed on the DNA swabs disclosed a mixture of DNA belonging to two or more people. Wynne could not be excluded as a contributor to the DNA mixture on either swab. However, the DNA profiles generated from the swabs were fairly common. For Wynne, the probability that a random individual's DNA profile matched the DNA profile in question from the left-hand swab was 1 in 848 for Caucasians, 1 in 1,540 for African-Americans, and 1 in 791 for American Hispanics. And, the probability that Wynne expressed the same DNA profile as the profile in question from the right-hand swab was 1 in 36 for Caucasians, 1 in 61 for African-Americans, and 1 in 71 for American Hispanics.

(f) Additional Evidence and
Fingerprints From Jeep

The Jeep was towed to the police impound lot for further processing. Two baggies of marijuana and a white pill containing cocaine HCL were found lying on the center console next to the gearshift. Crime laboratory technicians lifted fingerprints from the exterior of the Jeep and kept 11 prints they determined were "identifiable." Eight of those prints belonged to five of Haynes' friends, four of whom had recently been inside the Jeep. Of the remaining three prints, two were not identified, while the third print, found on the rear passenger-side door, matched Wynne's left palm.

Considerable time was spent at trial exploring the methods by which fingerprint evidence is collected and analyzed, the

qualifications of the individuals who collected and analyzed the prints in this case, and the mishandling of fingerprint evidence (unassociated with the evidence in this case) in 2012 by Omaha Police Department crime laboratory employees. We have thoroughly reviewed this evidence, but for the sake of brevity, we note only the following: In September 2012, an Omaha Police Department crime laboratory employee misidentified a fingerprint. Two other employees who reviewed the work in 2012 verified her identification of the print at that time. The print was not removed from a database used by the laboratory as it should have been. In March 2014, another crime laboratory employee ran a "reverse search," which revealed the misidentification, which misidentification was verified by several other crime laboratory employees. The employees involved in the 2012 misidentification were suspended from casework for about 6 months after the discovery of the misidentification, took additional formal training in fingerprint identification, and were subject to additional monitoring after returning to identification work. The crime laboratory manager also initiated an audit of other fingerprint identifications performed by the individuals involved in the misidentification, which audit did not reveal any other misidentifications. The crime laboratory is not accredited by the American Society of Crime Lab Directors, an entity that accredits laboratories "overall" and in "varying concentration areas," but the entire police department, including the laboratory, is accredited by the Commission on Accreditation for Law Enforcement Agencies, although that accreditation is not specific to "specialties in the crime lab." The International Association for Identification is an accrediting body that certifies individuals in various aspects of forensic science including the area of fingerprint comparison. One crime laboratory employee was certified by that association in the area of fingerprint comparison at the time the misidentification was discovered, but no crime laboratory employees were certified in that area in 2012.

The fingerprint identifications resulting from the evaluations performed by the Omaha Police Department crime laboratory employees of the 11 prints at issue in this case were each verified by another technician in the Omaha laboratory. The identification of Wynne's print was also verified by a Lincoln Police Department employee who is a certified latent print examiner. We note that the Omaha crime laboratory employee who verified the identification of Wynne's print was one of the individuals involved in the 2012 misidentification. She is the only certified print examiner in the Omaha laboratory and became certified after the 2012 misidentification but prior to both its discovery and her verification of Wynne's print. After the 2012 misidentification was discovered, the employee notified the International Association for Identification, but the 2012 misidentification did not affect her certification status.

(g) Admission of Telephone Records

Certain exhibits were admitted into evidence at trial which showed details of contacts between the cell phone with the telephone number attributed at trial to Wynne and Haynes' cell phone found in his Jeep after his murder. Some of these exhibits also reflect contacts between Wynne's cell phone and the telephones being used by some of his family members and his girlfriend during July 2013. Given the focus of Wynne's assignments of error on appeal, we discuss the admission into evidence of only two of those exhibits: exhibit 178, a table containing incoming, outgoing, and missed calls exchanged by Haynes' cell phone and Wynne's cell phone and by Haynes' cell phone and a third telephone between July 10 and 14; and exhibit 179, a table containing incoming and outgoing text messages (including the actual content of the text messages) exchanged by Haynes' cell phone and Wynne's cell phone on July 14 between 12:35 and 12:43 p.m. Exhibit 179 reflects a series of text messages in which the user of Wynne's cell phone agreed to purchase marijuana from

Haynes. Exhibit 178 shows, among other things, that several calls were exchanged by Wynne's cell phone and Haynes' cell phone between 2:48 and 3:09 p.m. on July 14, shortly before Haynes was murdered.

When the State first offered exhibits 178 and 179, Wynne objected to both exhibits on authentication and hearsay grounds. The district court overruled Wynne's objections as to exhibit 178 and received that exhibit into evidence, but the court sustained Wynne's hearsay objection as to exhibit 179. Wynne also argued that there was not sufficient evidence to indicate that he was the author of the text messages contained within exhibit 179. With respect to exhibit 179, the court noted that nothing in the content of the text messages identified Wynne specifically or anyone else as "the maker of those text messages" and noted further that the fact that text messages were sent from Wynne's cell phone was not sufficient to show Wynne actually authored the messages. The court ruled that the fact that text messages were sent from the cell phone previously identified as belonging to Wynne to the cell phone belonging to Haynes was admissible, but that based on the evidence at that point in the trial, the content of the text messages was not admissible.

Subsequently, the State offered testimony from a police officer which showed that in the days and hours before Haynes was murdered, Wynne's cell phone was in contact with the telephones of several of his family members and his girlfriend, as well as the telephone of a person unidentified at trial who also called Haynes shortly before he was murdered. The State again offered exhibit 179 with the text message content into evidence, and Wynne renewed his prior objections. The district court sustained Wynne's objections, but it agreed to hear additional argument from the parties. After the jury was released for the day, the court heard further argument with respect to the admissibility of the text message content.

Finally, the district court ruled as follows:

I never like — these close calls that are significant are difficult, but I re-looked at a number of cases, and, really — although authentication and — really, all that they have to authenticate is that this — the authentication goes to whether or not it's actually the [d]efendant that made — that sent the text messages or whether there is a likelihood that it wasn't the [d]efendant.

The case law is pretty clear across the board, and I looked at the federal cases that have established this, that the government only needs to make a prima facie showing of authenticity by a — and it's merely by a preponderance of the evidence, and there [are] cases that indicate that it can be proved by circumstantial evidence involving the timing of the receipt and the transmission of the text messages. I think that because of the burden that the government has, that [it] merely only need[s] to make a prima facie showing, because of the fact that subsequent to this morning, when all we had, I think, was [Wynne's] association with that number, I think now there is enough evidence for the government to meet [its] preponderance of the evidence and prima facie showing of authenticity based on the facts and circumstances surrounding the timing of the transmission and receipt of the text messages, and so I'm going to allow Exhibit 179 into evidence.

### (h) Details of Telephone Records

Wynne's father had an account with a cell phone service provider, and Wynne's mother testified that in July 2013, Wynne was using a cell phone with a phone number assigned to that account; we have referred to that cell phone in this opinion as "Wynne's cell phone." She also identified the cell phone numbers being used by herself, Wynne's father, and Wynne's older brother. Wynne's girlfriend identified her home telephone number on the record and testified that she sometimes called Wynne from that number. Several of the telephone

record exhibits admitted into evidence were highlighted with
different colors used to represent contacts between Wynne's
cell phone and the telephones used by other individuals as well
as contacts between Haynes' cell phone and the telephones
used by other individuals. On those exhibits, a telephone num-
ber is highlighted in gray, and we will refer to it in this opinion
as "the gray number." The user or owner of the telephone asso-
ciated with the gray number was not identified in the evidence
presented to the jury at trial.

Police extracted data from Haynes' cell phone, which dis-
closed several contacts between Wynne's and Haynes' cell
phones on July 14, 2013. At 12:33 p.m., a call was made from
Wynne's cell phone to Haynes. At 12:35 p.m., Haynes sent a
text message to Wynne's cell phone stating, "I got Dro." The
reply from Wynne's cell phone at 12:37 p.m. stated, "Ight
koo.. Im bouta run ta da bank den im get some of both.. U
gon look out.?" At 12:39 p.m., Haynes sent a text to Wynne's
cell phone stating, "call me," and the reply from Wynne's cell
phone at 12:42 p.m. stated, "Ight." We note testimony in the
record indicating that "dro" is a slang term for "hydroponic
marijuana." Calls from Wynne's cell phone were logged by
Haynes' cell phone at 2:48 p.m. as "[m]issed" and at 2:49 p.m.
as "[i]ncoming." Additional calls were exchanged by the two
cell phones between 3:02 and 3:05 p.m. Between 3:06 and 3:08
p.m., Haynes' cell phone logged two incoming calls from the
gray number. Haynes' cell phone logged an outgoing call to
Wynne's cell phone at 3:08 p.m. As noted above, Haynes was
murdered at approximately 3:10 p.m.

A review of the subpoenaed records for Wynne's cell phone
confirms the text and call contacts between Wynne's cell
phone and Haynes on July 14, 2013, although there are some
discrepancies in the various telephone record exhibits as to
the exact contact times and number of contacts made depend-
ing on which "target number" was used to generate the exhib-
its. The police officer who testified about these exhibits was
unable to explain these discrepancies, as he was "not a data

person or records keeper for [the cell phone provider used by Wynne and Haynes]." In addition to the contacts between the two cell phones on July 14, the records for Wynne's cell phone showed that calls were placed from Wynne's cell phone to Haynes on July 10 and 13. Wynne's cell phone had several contacts with the gray number on July 14, including texts before and calls both before and after the initial contact with Haynes. Wynne's cell phone also received calls from the gray number on June 1 and 29 and sent a text message to it on July 13. Finally, although several calls and text messages were sent from Wynne's cell phone to various people on July 14, including Wynne's girlfriend, father, and older brother, all outgoing communications from Wynne's cell phone had ceased by 3:04 p.m. Wynne's mother testified that Wynne's cell phone was reported "lost," but she did not specify when this occurred. Wynne's girlfriend recalled learning at some point that Wynne had lost his cell phone, but she did not recall the date. Wynne's cell phone number was "deactivated" on July 31.

### (i) Search Warrant and Arrest

On November 11, 2013, a search warrant for Wynne's residence was executed by law enforcement looking for firearms and cell phones. As of the date of trial, neither Wynne's cell phone nor the gun used to shoot Haynes had been found. Wynne was arrested on December 20.

### (j) Motion for Mistrial

During the State's initial closing argument, the prosecutor stated:

> And why was it the officers felt they needed to talk to this . . . number later determined to be the phone number of . . . Wynne . . . ? Because you can see — we will go in reverse chronological order — the 14th day of July, 2013, at 3:08:29 p.m., . . . Haynes' phone placed a call to the . . . Wynne number.

If we think about that, 3:08:29, if the murder occurred just immediately before 3:10 p.m., this outgoing phone call placed by [Haynes] to [Wynne's] number was placed within a minute, minute and a half of . . . Haynes' murder. But that's not the only call.

As we continue, you will see that there are — prior to that . . . Haynes had received two other incoming phone calls from a number we don't have a name to associate it with, [the gray number]. There was never an outgoing call from . . . Haynes' phone to that number. Just two incoming calls. And in terms of that number, the [gray number], you'll see in the later records that that's the number highlighted in gray.

The State discussed the sequence of the contacts between the various telephone numbers, including the gray number, at length during its initial closing argument and made two more references to the gray number. First, the prosecutor stated: "Of significance here is now, once again, we start seeing that gray number. What's the gray number again? That's the number we don't know, that's the number that contacted [Haynes], and, once again, that's the number that's also contacting and being contacted by [Wynne] from his phone." Later, the prosecutor stated: "This is one of those cases where you don't have an eyewitness saying, 'This is the person who did it,' you don't have a co-[d]efendant because we have never been able to identify that person in the gray number in terms of the evidence you heard throughout this trial."

Wynne did not object to the prosecutor's comments at the time they were made, but following the State's closing argument and prior to his own closing argument, Wynne made an oral motion for mistrial based on prosecutorial misconduct. Wynne argued that the State's assertion that it was unable to identify the user of the gray number was false because the police had previously identified an individual as the user of that number, a fact recently confirmed by that individual during a police interview. The district court received into

evidence two exhibits offered by Wynne in support of his motion: (1) e-mail correspondence regarding a police interview of the individual on April 3, 2015, and (2) a supplemental police report showing police awareness of the individual's association with the gray number. The State argued that its assertions with respect to the gray number were not false because the prosecutor had specified that the user of the gray number was unknown "based upon the evidence in this case." The State argued further that "to the extent that there is a concern," the prosecutor's cocounsel would "clear that up in rebuttal."

The district court overruled Wynne's motion, but it agreed to revisit the issue after transcription of the closing arguments. The court provided a limiting instruction to the jury prior to Wynne's closing argument, stating:

> Ladies and Gentlemen, I do want to instruct you. Arguments of counsel are not evidence. Comments of counsel regarding what evidence may or may not exist is not evidence. Reference[s] to evidence the State may or may not possess that was not put before you are to be disregarded completely.

During Wynne's closing argument, his attorney made the following reference to the prosecutor's statements about the gray number:

> So because their scientific evidence is so lacking, we are left with the prosecutors putting together a story about what these known [telephone] contacts mean, what the content of them is, even though [the prosecutor] has, other than these several texts, absolutely no evidence, zero, to support his statements. He paints this picture about here's what happened. You know, [Wynne and the other individual shown in the surveillance video] said they were going to do a robbery with this phone number that there is no evidence to support who it is.

Finally, during the State's rebuttal closing argument, the prosecutor's cocounsel stated:

I want to clarify something that [the prosecutor] might have misstated in his closing argument about whether there was evidence as to who that gray . . . number was [attributable to]. I just want to clarify that in this trial you heard no evidence about whose number that was.

But the point of all of those phone numbers — and I'm not going to spend a great deal of time talking about the phone numbers because I think [the prosecutor] went through it enough. The point is that that was . . . Wynne's phone. He was talking and texting to all of these people who are close to him, all of these people who are close to him and . . . Haynes at the time of [Haynes'] death.

### 3. Convictions

On April 9, 2015, the jury found Wynne guilty on both counts of the information. The district court accepted the jury's verdicts and entered judgment accordingly.

### 4. Motion for New Trial

Wynne filed a motion for new trial, alleging, among other things, that the district court erred by denying his motion for mistrial based on the prosecutor's prejudicial misconduct during closing arguments and by overruling his objections to the admission into evidence of the content of the text messages extracted from Haynes' cell phone. On June 23, 2013, the district court entered an order overruling Wynne's motion.

### 5. Sentencing

On August 27, 2015, the district court entered an order sentencing Wynne to 40 to 100 years' imprisonment for first degree murder and to a consecutive sentence of 10 to 20 years' imprisonment for use of a deadly weapon (firearm) to commit a felony. The court gave Wynne 544 days' credit for time served.

## III. ASSIGNMENTS OF ERROR

Wynne asserts that the district court erred in admitting the text messages into evidence and in denying his motion for mistrial based on prosecutorial misconduct during the State's closing argument. Wynne also asserts that the evidence was insufficient to sustain his conviction for first degree murder on either of the State's alternate theories.

## IV. STANDARD OF REVIEW

[1-3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Ash*, 293 Neb. 583, 878 N.W.2d 569 (2016). When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Carpenter*, 293 Neb. 860, 880 N.W.2d 630 (2016). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State v. Edwards*, 294 Neb. 1, 880 N.W.2d 642 (2016).

[4] The decision whether to grant a motion for mistrial is within the discretion of the trial court, and an appellate court will not disturb the ruling on appeal in the absence of an abuse of discretion. See *State v. Goynes*, 278 Neb. 230, 768 N.W.2d 458 (2009).

[5,6] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Jenkins*, 294 Neb. 475, 883 N.W.2d 351 (2016). The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing

the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

## V. ANALYSIS

### 1. Admission of Text Messages

Wynne asserts that the district court erred in admitting exhibit 179, a series of text messages, into evidence over his objections. We first address whether there was sufficient foundation for the admissibility of the text messages and then whether they were inadmissible hearsay.

### (a) Foundation

[7] Generally, the foundation for the admissibility of text messages has two components: (1) whether the text messages were accurately transcribed and (2) who actually sent the text messages. *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016).

[8-11] Authentication or identification of evidence is a condition precedent to its admission and is satisfied by evidence sufficient to prove that the evidence is what the proponent claims. *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016). Neb. Rev. Stat. § 27-901(1) (Reissue 2008) does not impose a high hurdle for authentication or identification. *State v. Elseman*, 287 Neb. 134, 841 N.W.2d 225 (2014). A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity. *Id.* If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of § 27-901(1). *State v. Elseman, supra.*

Wynne does not argue that the text messages detailed in exhibit 179 were not accurately transcribed from Haynes' cell phone. In our review, we find the testimony of the police officer who extracted this data from Haynes' cell phone sufficient to authenticate the messages as set forth in exhibit

179 as accurate transcriptions of the messages from Haynes' cell phone.

At trial and on appeal, Wynne's primary argument is that there was not sufficient foundation to show that he was the person who sent the text messages attributed to him. He argues that there was no direct evidence presented to show who actually authored the messages attributed to him or who was in possession of the cell phones at the time the messages were sent and received. He notes that while the cell phone from which the messages were extracted was found in the Jeep next to Haynes following his death, the cell phone attributed to Wynne was never recovered, and thus, no data was extracted from it. He also notes that the number of the cell phone attributed to him was assigned to his father's cell phone service provider account and argues that there is no evidence to show that he was the sole user of the cell phone. Finally, he argues that there is nothing in the content of the text messages that identifies him as the author.

The Nebraska Supreme Court recently addressed the foundation for admissibility of text messages in *State v. Henry, supra*. In that case, the defendant argued that there was insufficient foundation that he authored the text messages attributed to him, noting the lack of evidence that he was the record owner of the cell phone in question and the presence of evidence that the cell phone was found in the post office box of another individual who claimed ownership. He also noted that through "'text spoofing,'" a text message can be made to appear to have been sent from a telephone number other than the number from which it was actually sent. *Id.* at 868, 875 N.W.2d at 399. In addressing these arguments, the Supreme Court stated:

> In similar cases, testimony concerning context or familiarity with the manner of communication of the purported sender is sufficient foundation for the identity of the sender of the message. Such testimony is typically in combination with testimony that the cell

> phone number belonged to or was regularly utilized by
> the alleged sender. The proponent of the text messages
> is not required to conclusively prove who authored the
> messages. The possibility of an alteration or misuse by
> another generally goes to weight, not admissibility.

*Id.* at 868, 875 N.W.2d at 400. In finding sufficient foundation
for the admission of the text messages, the Supreme Court in
*State v. Henry* noted testimony establishing the defendant as
a regular user of the cell phone, testimony that the defendant
answered the cell phone at the number in question when a wit-
ness called it, and testimony connecting the defendant with the
messages based on the witness' familiarity with their context
and the way the defendant spoke.

In this case, the evidence showed that Wynne used his cell
phone, with the number assigned to an account belonging to
Wynne's father, during July 2013. There was also evidence
to show that in the days and hours prior to Haynes' murder,
there was contact between the cell phone attributed to Wynne
and the telephone numbers of various family members and
also Wynne's girlfriend. And, there is no evidence in the
record to suggest that anyone other than Wynne was using
the cell phone in question at the time of Haynes' murder. The
content of the text messages, which arranged a drug transac-
tion, and the sequence of subsequent call contacts between
the cell phone attributed to Wynne and Haynes' cell phone are
also consistent with the timeline established for the murder.
All outgoing contacts by the cell phone attributed to Wynne
ceased just shortly before the murder occurred. The district
court did not abuse its discretion in overruling Wynne's
objections with respect to his authorship of the text messages
attributed to him.

### (b) Hearsay

[12] Wynne also objected to exhibit 179 on the basis of
hearsay, although he does not separately argue this claim
in his brief on appeal, and as noted above, the focus of his

arguments at trial was that the evidence was insufficient to show he was the person who sent the text messages. In arguing his objections to the district court, Wynne's trial counsel conceded that if there were sufficient evidence to indicate that Wynne was the author of the messages attributed to him, they would not be hearsay. We agree. As discussed above, there was sufficient evidence to establish that Wynne authored the text messages attributed to him. Because those text messages were his own statements, they were not hearsay. See, Neb. Rev. Stat. § 27-801(4)(b)(i) (Reissue 2008); *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016) (finding that defendant's text messages offered against him were statements of party opponent and not hearsay). Nor were text messages attributed to Haynes hearsay. Those messages were offered to show their effect on Wynne, i.e., how he responded to the proposed drug transaction. A statement is not hearsay if the proponent offers it to show its impact on the listener and the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case. *State v. Poe*, 292 Neb. 60, 870 N.W.2d 779 (2015). To the extent that Wynne claims the district court improperly overruled his hearsay objection to exhibit 179, that claim is without merit.

### 2. Motion for Mistrial

Wynne asserts that the district court erred in denying his motion for mistrial based on prosecutorial misconduct during the State's closing argument. He argues that the prosecutor's comments about not knowing whom the gray number belonged to were false and misleading. Wynne further argues that the State's rebuttal argument did not clear up the error and was further misleading in that the State misstated the gray number and went on to speak about Wynne's cell phone without clarifying that the "phone [the prosecutor] was referencing was not the 'unknown' phone . . . ." Brief for appellant at 24. Wynne argues that this statement led to the inference that the

unknown telephone was connected to him or was otherwise unimportant to the investigation.

[13-17] When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct. *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016). A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct. *Id.* If an appellate court concludes that a prosecutor's acts were misconduct, the court next considers whether the misconduct prejudiced the defendant's right to a fair trial. *Id.* Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process. *Id.* Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole. *Id*.

In *State v. McSwine, supra*, the Nebraska Supreme Court reversed a decision by this court, finding that the prosecutor's comments during closing and rebuttal argument did not constitute prosecutorial misconduct and that the defendant was not prejudiced by the prosecutor's comments. In that case, the comments at issue related to the defense at trial that certain text messages did not refer to the crimes charged but related to an earlier incident of trespassing by the defendant. Specifically, the prosecutor observed that there was no evidence "'at all,'" other than the defendant's testimony, about the earlier incident. *Id.* at 575, 873 N.W.2d at 413. The defendant did not object to the comments at the time. During deliberations, the jury inquired about the prosecutor's comments, was instructed that it had all of the evidence it would receive, and was directed to the jury instruction stating that statements, arguments, and questions of the lawyers were not evidence. The defendant did not challenge the prosecutor's comments as misleading until his motion for new trial, at which time he offered police reports about the trespass incident into evidence. On appeal, this court concluded that the comments were misleading, reasoning that the prosecutor did

not limit the term "evidence" in his comments to the evidence presented at trial and that the comments suggested that there was no evidence at all to support the defendant's testimony about the trespass incident. See *State v. McSwine*, 22 Neb. App. 791, 860 N.W.2d 776 (2015), *reversed* 292 Neb. 565, 873 N.W.2d 405 (2016). On further review, the Nebraska Supreme Court disagreed.

[18,19] First, the Nebraska Supreme Court observed that while there were police reports about the trespass incident and the State was aware of these reports, the reports were not offered at trial. The Supreme Court concluded that the jury was not misled or unduly influenced by the prosecutor's comments, because the jury was "well instructed as to what 'evidence' was within the context of th[e] trial" and it was undisputed that no evidence was presented at trial to corroborate the defendant's testimony about the trespass incident. *State v. McSwine*, 292 Neb. at 576, 873 N.W.2d at 414. The Supreme Court observed that a prosecutor must base his or her argument on the evidence introduced at trial rather than on matters not in evidence. *Id.* Further, a fact finder can rely only on evidence actually offered and admitted at trial and is not permitted to rely on matters not in evidence. *Id.* Accordingly, the Supreme Court concluded that the comments were not misconduct, but went on to conclude that even if the statements were prejudicial, they were not so prejudicial as to violate the defendant's due process rights.

(a) Statements Were Not Misconduct

In this case, unlike in *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016), the prosecutor did qualify his statements about the gray number. Although he initially stated that the gray number was "the number we don't know," he went on to state, "[W]e have never been able to identify that person in the gray number in terms of the evidence you heard throughout this trial." During rebuttal argument, the prosecutor's cocounsel clarified that the jury heard no evidence "in

this trial" about "whose number [the gray number] was." Although Wynne presented evidence to the district court during argument on his motion for mistrial, indicating that the gray number was associated with a known individual and that the State was aware of this connection, it is undisputed that no evidence of the connection was presented to the jury at trial.

During the rebuttal argument by the prosecutor's cocounsel, she misstated one digit in the prefix of the gray number, an error easy enough to make given the plethora of telephone numbers discussed at trial, but not one unduly misleading, given that she correctly stated the final four digits of the gray number. After commenting that there was no evidence at trial as to the user of the gray number, the cocounsel continued her rebuttal argument and went on to discuss Wynne's cell phone without explicitly stating that she was changing topics and was now discussing a different cell phone, the one with the telephone number attributed to Wynne at trial. We do not read this lack of transition as "an adroit attempt to confuse the jury by lumping all the last calls to [Haynes'] phone as coming from [Wynne's] phone." See brief for appellant at 24. When the cocounsel's remarks are read as a whole, it is clear that she was no longer discussing the gray number. And in the context of the entire trial, in which all of the various telephone numbers were addressed at length, we do not believe the jury was misled or unduly influenced by the cocounsel's lack of a segue between one portion of her rebuttal and the next. We also note that Wynne did not object to these particular remarks or renew his motion for mistrial. Further, most of Wynne's argument at the hearing on his motion for new trial was addressed to the district court's admission of the content of the text messages. His brief argument about the prosecutorial misconduct issue focused on the statements made by the prosecutor during the State's initial closing argument.

Like the jury in *State v. McSwine*, 292 Neb. at 576, 577, 873 N.W.2d at 414, the jury in this case was "well instructed" as

to what was evidence in the context of the trial and was specifically instructed that "'[s]tatements, arguments and questions'" of the lawyers are not evidence. After the State's initial closing argument and prior to Wynne's closing argument, the district court instructed the jury that arguments of counsel are not evidence and that comments of counsel regarding what evidence may or may not exist are not evidence. And, during formal jury instructions, the jury was informed of its duty to decide the facts and informed that in doing so, it must "rely solely upon the evidence in this trial and that general knowledge that everyone has." The jury was further instructed that the evidence from which it was to find the facts consisted of the testimony of the witnesses, the exhibits received in evidence, any stipulated facts, and any facts that "[the judge] say[s the jurors] may accept but are not required to accept." The jury was again informed that statements, arguments, and questions of the lawyers for the State and Wynne were not evidence.

[20,21] The purpose of jury instructions is to ensure decisions that are consistent with the evidence and the law, to inform the jury clearly and succinctly of the role it is to play and the decisions it must make, and to assist and guide the jury in understanding the case and considering testimony. See *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016). Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict. *Id.*

Unlike the prosecutor in *State v. McSwine, supra*, both the prosecutor and his cocounsel in this case qualified their references to "evidence" to indicate they were referring to evidence presented at trial. We conclude that the jury was not misled or unduly influenced by the comments about there having been no evidence presented at trial as to the user of the gray number. These statements were not misconduct. Nor do we find the cocounsel's further comments in rebuttal to be misconduct. Nonetheless, as set forth below, even if any of these statements, those of either the prosecutor or his

cocounsel, were misconduct, they were not so prejudicial as to violate Wynne's due process rights.

### (b) Statements Were Not Prejudicial

[22] In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, an appellate court considers the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction. *State v. McSwine, supra*.

The statements of the prosecutor and his cocounsel did not mislead or unduly influence the jury to a significant degree. Their remarks about the gray number were qualified as being about the evidence presented at trial. And, the jury in this case was well instructed on what it was to consider in its deliberations. It was instructed to consider only evidence presented at trial and instructed that counsel's statements, arguments, and questions were not evidence. The first factor weighs against prejudice.

Next, the comments in question were not extensive in the context of the lengthy initial closing and rebuttal arguments. Nor do we see any indication that defense counsel invited the remarks, except to the extent that the possibility of clarifying rebuttal remarks by the prosecutor's cocounsel was discussed during the arguments on Wynne's motion for mistrial. The second and third factors weigh against prejudice.

With regard to the fourth factor, the district court did give a curative instruction following the State's initial closing argument. And, as noted above, the possibility of clarifying remarks by the prosecutor's cocounsel was discussed in connection with Wynne's motion for mistrial. Wynne did not object to the additional comments by the prosecutor's cocounsel of which he complains. Nor did he make a further motion

for mistrial or explicitly address these additional comments in arguing his motion for new trial to the district court. Again, however, the jury was instructed on what it was to consider in its deliberations. This factor is neutral.

Finally, as addressed more explicitly below in connection with our analysis of Wynne's third assignment of error, there is sufficient evidence to support Wynne's convictions. The fact that there were two individuals involved in the commission of these crimes was clearly known throughout the trial, and the failure of the State to identify the potential user of the gray number did not preclude the possibility that Wynne was one of the individuals involved in the crimes.

Thus, even assuming that the statements by the prosecutor and his cocounsel were misconduct, they were not prejudicial.

### 3. Sufficiency of Evidence

Wynne asserts that the evidence was insufficient to sustain his conviction for first degree murder on either of the State's alternate theories: felony murder in the commission of or attempt to commit a robbery or intentional killing with premeditation and deliberation. Wynne argues that there was no witness to place him at the scene and challenges the credibility of the fingerprint evidence and the weight to be given to that and the relatively inconclusive DNA evidence. He also relies on the timelines established through the testimony of his mother and his girlfriend. He argues that there is no evidence to support a finding of premeditation or deliberation by him and insufficient evidence to support the felony murder theory of robbery or attempted robbery.

Because Wynne does not challenge the sufficiency of the evidence to support his conviction for use of a deadly weapon to commit a felony, either in his third assignment of error or in his arguments, we address the sufficiency of the evidence to support only his conviction for first degree murder. Pursuant to § 28-303, a person commits murder in the first degree if he or she "kills another person (1) purposely and with deliberate and

premeditated malice, or (2) in the perpetration of or attempt to perpetrate . . . robbery."

Wynne essentially urges us to reweigh the evidence and pass on the credibility of witnesses, something an appellate court does not do, as those matters are for the finder of fact. See *State v. Jenkins*, 294 Neb. 475, 883 N.W.2d 351 (2016). When viewed in the light most favorable to the State, the evidence was sufficient to support Wynne's conviction for first degree murder. The evidence showed that Wynne agreed via text message to purchase marijuana from Haynes and that after exchanging several cell phone calls with Haynes, Wynne arrived with another individual at the parking lot of the beauty supply store, where Haynes was murdered. The evidence also shows that the second individual held back while Wynne proceeded to interact with Haynes outside the open front passenger door of the Jeep, leaving a palmprint in the process, and that Wynne shot Haynes, taking some of his marijuana, which was scattered outside of and behind the Jeep and in the direction of his travel as Wynne and his companion fled the parking lot. In short, the evidence at trial could have led a rational juror to find the essential elements of the crime beyond a reasonable doubt. Wynne's third assignment of error is without merit.

## VI. CONCLUSION

The district court did not err in admitting the content of the text messages into evidence or abuse its discretion in denying Wynne's motion for mistrial. The evidence was sufficient to support Wynne's murder conviction.

Affirmed.